## NATIONAL DISABLED SOLDIERS' LEAGUE, Inc., v. HAAN.

(Court of Appeals of District of Columbia. Submitted December 10, 1924. Decided March 2, 1925.)

No. 4144.

1. Libel and slander ⊙⟿123(8)—Where facts and circumstances of publication undisputed, privilege question of law for court.

Where facts and circumstances in connection with publication of alleged libel are undisputed, question of privilege is one of law for court.

2. Libel and slander ⊙⟿47—Communication to Senator defaming organization of disabled soldiers held qualifiedly privileged.

Where district manager of United States Veterans' Bureau, in answer to complaints, made report to his superior containing matter claimed to be defamatory of disabled soldiers' organization, officer of which had made complaint, and in response to letter from United States Senator complaining of same conduct sent Senator copy of such report, *held* that Senator was agent of plaintiff, and had such interest in subject-matter and occupied such position that publication was qualifiedly, though not absolutely, privileged.

3. Libel and slander ⊙⟿51(1)—Where facts rebut prima facie inference of malice, plaintiff must show express malice in qualifiedly privileged publication.

Where facts rebut prima facie legal inference of malice arising from qualifiedly privileged publication of libelous matter, plaintiff to recover must prove express malice.

4. Libel and slander ⊙⟿4, 123(6) — Express malice is question for jury, and may be found from language itself, as well as from extrinsic evidence.

Express malice is question for jury, and may be found from language itself, as well as from extrinsic evidence.

5. Libel and slander ⊙⟿123(8)—Where publication qualifiedly privileged, and language itself does not establish malice, verdict should be directed, unless plaintiff shows malice.

Where publication of libel was qualifiedly privileged, and language of communication and attending circumstances are as consistent with nonexistence as with existence of malice, court should direct verdict for defendant, unless plaintiff produces extrinsic evidence of actual malice.

6. Libel and slander ⊙⟿51(2)—Defamatory letter, published on occasion of qualified privilege, held not in itself or circumstances indicative of actual malice.

Letter defamatory of corporation organized to present claims of disabled soldiers, written by district manager of U. S. Veterans' Bureau to his superior in explanation of charges made by officer of defamed corporation, and copy of which was forwarded to United States Senator in answer to letter making similar complaint, *held* neither in its language nor in circumstances surrounding its publication indicative of actual malice.

Appeal from Supreme Court of District of Columbia.

Action for libel by the National Disabled Soldiers' League, Incorporated, against Albert E. Haan. Judgment for defendant, and plaintiff appeals. Affirmed.

Abner Siegal, of Washington, D. C., for appellant.

Peyton Gordon and V. E. West, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and HATFIELD, Judge of the United States Court of Customs Appeals.

HATFIELD, Acting Associate Justice. This is an action for libel. Suit was brought by the appellant, the plaintiff below, against the appellee, defendant below. At the conclusion of the introduction of evidence by the parties, the court directed a verdict for the defendant. Judgment was entered on the directed verdict, and the plaintiff appealed.

It appears that plaintiff is a membership corporation, incorporated under the laws of the state of New York, with national headquarters at 1714 Pennsylvania Avenue, Northwest, Washington, D. C. Very little evidence was submitted as to the activities of the organization, but it does appear that through its National Adjutant, Samuel J. Reed, it represented disabled soldiers of the World War in the presentation of the claims of such soldiers to the officials of the United States Veterans' Bureau, for such relief, financial or otherwise, as is provided by law. The defendant was the district manager of district No. 4 of the United States Veterans' Bureau, Washington, D. C.

On January 30, 1922, the National Adjutant of the plaintiff, one Samuel J. Reed, in a lengthy communication, in the form of an affidavit, to the Director of the United States Veterans' Bureau, complained concerning the conduct of the defendant in his official relations with the representative of the plaintiff. We quote the following:

"I, Samuel J. Reed, being duly sworn, depose and say, that I am the National Adjutant of the National Disabled Soldiers' League, with national headquarters at 1714 Pennsylvania Avenue, Northwest, Washington, D. C., and have been appearing for the past year in the Veterans' Bureau as a representative for the disabled men who appeal their cases through this organization. * * * * "

This statement is followed by charges against the defendant. In substance it was charged that the defendant or other officials in the Veterans' Bureau had refused to give information to a colored ex-soldier regarding a paper on file in his case; that the defendant had been evasive in his replies to plaintiff's representative regarding the existence of such document, and that it was only by persistent effort that affiant was able to learn from defendant that such document was on file in the case; that defendant was overbearing, hostile, and rudely officious in manner; that in the opinion of affiant the defendant was unfriendly toward all disabled men; that he did not possess proper sympathy nor understanding for one in his official position; that he was unqualified for the office he occupied and unworthy of a salary of $4,500 per year. The affidavit is concluded by the following paragraph:

"I concluded by telling him that it was the first time during my visits the past year to the Veterans' Bureau that I had not been treated as a gentleman and *promised him*

*that he would hear further from his czaristic and ungentlemanly attitude."* (Italics ours.)

The Director of the Veterans' Bureau submitted the affidavit to the defendant and in memorandum requested an explanation. Under date of February 2, 1922, the defendant replied to the memorandum of the Director.

"February 2, 1922.

"The Director U. S. Veterans' Bureau, Washington, D. C. Through District Organizations—Dear Sir: I am in receipt of your memorandum and rambling communication from Mr. Samuel J. Reed, in which accusations in general are made of the Fourth District, United States Veterans' Bureau, and specific complaint concerning the manager.

"I cannot help but note the personal opinions and inferences which are implied in this affidavit. Nevertheless, I am surprised at the attitude of Mr. Reed and the statements which he makes. To the best of my knowledge, Mr. Reed has always received from members of the Fourth District fair and courteous treatment. In many instances, has other work of equal or more importance been laid aside to favor him, upon matters which he placed before us for attention.

"I have a closed door to no person or persons, and in fairness to those who wish to see the district manager, it is sometimes necessary that others are caused slight inconvenience by delay. This same procedure is carried out in all sections of the district office and all suboffices. I say I am surprised at this letter, inasmuch as this is the first instance that any such accusations have been made concerning myself, during eight years of military and naval service and two years of service with the government among ex-service men.

"The subject-matter of this incident seems to be the case of Samuel Singletary, a colored patient of the United States Veterans' Bureau, at Mt. Alto Hospital. This man entered service in July, 1918, and was discharged in June, 1919 (the discharge reading, "physical condition good"). The Adjutant General's office has found no record of illness in this man's personal history during service.

"In February, 1920, he filed a claim for disability rights, giving his own reasons as chronic appendicitis. The examination report of February 24, 1920, shows no evidence of lung or heart disease. Subsequently he was examined a few times, and in an examination report of November, 1921, evi-

dence of active tuberculosis, moderately advanced, was discovered.

"The claim has continuously been disallowed, based upon no disability and no service connections. Inasmuch as no symptoms of tuberculosis were found under paragraph 2, section 18 of the act, the two-year clause of admission could not be applied even with a considerable benefit of doubt. This case has been reviewed a great many times, at the request of the claimant, congressmen, service organizations, and I believe Dr. Crossland was personally interested at some time.

"On January 20, 1922, the case was placed before the District Board of Appeals, which board, after due consideration of all the facts submitted, was of the unanimous opinion that the case could not be allowed. It is most unfortunate that the claimant is now suffering from active tuberculosis. However, I can see no relief or a difference in judgment, unless evidence and facts are submitted upon which the professional people, charged with the duty of examining and rating claims, in accordance with the Sweet Bill and amendments, change this opinion.

"With reference to Mr. Reed, who I understand is representing the National Disabled Soldiers' League, I have heard of no difficulties which he has encountered in the bureau. I understand he visits the bureau daily or nearly so, calling our attention and requesting review of cases of claimants in different parts of the country. In this instance, if I recall, he called this office requesting an interview with the district manager and was told on or about 2 o'clock would be convenient. At this time, Mr. Reed called upon me and remained with me until 3:30 p. m. I had the case of the claimant in question brought to me and carefully went over all the evidence with Mr. Reed. I explained to him this case had already been reviewed several times, and that on January 20 the highest authority in the district office had passed on it and made a decision; that there was very little that the district manager or any one else could do, unless additional and substantial evidence was introduced.

"I recall that Mr. Reed was quite persistent in cross-examining and questioning me on the various reasons for allowing or disallowing claims, the bureau procedure in general, and this case in particular. I regret that Mr. Reed interpreted my attitude at any time as being hostile or overbearing. Such was the furthest from my intentions.

I distinctly recall going through this case with great care, reading aloud various diagnoses and opinions from different reports, and explaining to Mr. Reed what bearing they had to the case. The first time going through, which probably took 10 or 15 minutes, I did not discover the affidavit which he refers to in the letter. He stated that was all he wanted to know, and that was the information which neither Singletary nor he could previously obtain from any one of our people. After further conversation, I commenced—through the case again and discovered a statement made by a Dr. McDonald, who had served with the organization of which Singletary was a member. This statement had received consideration at the hands of all past reviewers and referees, and in no way made it possible for a connection.

"Having served overseas, and wounded by shell fire at Soissons, and having lost a considerable number of men in action, I am naturally somewhat interested in men who served in other organizations and incurred a disability. This question being in no way personal, I fail to understand why Mr. Reed resented this question, unless he was not truthful concerning his own disability. At times Mr. Reed became quite impatient, stating that I had no use for his organization (meaning Disabled Soldiers' League), and that I was prejudiced against the negroes, and other remarks which inferred that I had a personal dislike for himself and his associates. At no time during this interview was there any loud or boisterous language, as he states, on the part of either one, and his reference to the attention which was caused by this alleged boisterousness was not that any one's attention was attracted, but, as I later discovered, a Congressman and three claimants at different times wished to interview me, and the secretary did not wish to interrupt our conversation.

"It is not my desire to answer this communication in any personal way. However, I think it well that you be informed of the full facts concerning Mr. Reed and his organization. Mr. Reed was discharged on April 1, 1919; filed a claim February, 1920, in New York. At that time, he was caretaker of an American Legion clubroom. The reasons given for filing a claim were asthma. His military record shows an attack of influenza, lasting one week. No disability was noted on discharge. On April 17, 1920, an examination disclosed a diagnosis of bronchitis and asthma. On May 27, 1920, his claim was allowed and an award of temporary total disability was made from date

of hospitalization (April 16, 1920) until July, 1920.

"Upon the submission of additional evidence, and subsequent to discharge from hospital, an award of 35 per cent. temporary partial, retroactive from date of discharge from military service to date of hospitalization, was made, which continued effective until date claimant entered vocational training, February 9, 1921. He voluntarily discontinued training on October 15, 1921, and since that time has received 25 per cent. temporary partial for chronic bronchitis. While training, his objective was stenography, and an attempt was made to have him in placement training with the organization which he represents. According to his record, he voluntarily left training, and I understand from the Washington city office that he is again negotiating to enter training with pay.

"I can safely say that the organization which he purports to represent has an unsavory reputation nationally. I will not go into detail as to the characters involved, but I can truthfully say, speaking for a great number of men who are suffering from bona fide wounds or gassing, that this organization does not represent the disabled men of the United States. A short time ago, as you probably are aware, one of the protégés of this organization, who had received extremely fair and equitable treatment by members of the Fourth District, approached the manager of the Washington city office and demanded that he be given further benefits to which he was not entitled under the law. He also demanded that his case be given to him, which was refused, whereupon he viciously struck the Washington city manager, who was seated at the time and was entirely unprepared for such an attack.

"There are cases too numerous to mention of which the district vocational officer, the Washington city vocational officer, and others can tell you of the workings of this organization through its self-elected members. The members of this district are very anxious to be kind and courteous to all ex-service men to whom they come in contact, and are ever ready to extend sympathy and forbearance. There are many instances on record of men coming in with guns, knives, and other weapons. Hardly a day goes by but what a threat is made upon some person or group of persons who are responsible for rendering an adverse decision to the interest of the claimant.

"There are a great number of organizations and persons who have taken it upon themselves to be the general benefactors of mankind and the disabled soldiers in particular. In a great number of these cases, the wool is carefully pulled over the eyes of the trusting ex-service men and the sentimental public by the pretense of rendering such valuable assistance and a comfortable living is made by these parasites.

"Respectfully,   Albert E. Haan,
                        "District Manager."

On February 3, 1922, Senator J. Thomas Heflin, a member of the United States Senate from the state of Alabama, wrote the defendant as follows:

"United States Senate.

"Washington, D. C., February 3, 1922.

"Mr. Albert Haan, District Manager District No. 4, Veterans' Bureau, Washington, D. C.—Dear Mr. Haan: Mr. Samuel J. Reed, who is one of the officers of the National Disabled Soldiers' League, with national headquarters at 1714 Pennsylvania Avenue, N. W., Washington, D. C., and who has occasion to take up with you from time to time the cases of disabled soldiers which need adjustment, has complained to me that on some occasions he has been received and treated by you in a most discourteous, abrupt, and petulant manner.

"Mr. Reed states that it would expedite the settlement of the claims of the soldiers he represents if a more cordial relationship existed, but this cannot be unless an example is set by the head of the office. I wish you would assure me that a repetition of some of the unpleasant incidents between yourself and Mr. Reed is now impossible.

"Whenever I can serve you, call on me. With best wishes, I am,

"Yours sincerely,   J. Thomas Heflin."

On the same day Senator Heflin wrote Mr. Samuel J. Reed as follows:

"February 3, 1922.

"Mr. Samuel J. Reed, % National Disabled Soldiers' League, 1714 Pennsylvania Ave., N. W., Washington, D. C.—Dear Mr. Reed: I am inclosing you herewith a copy of a letter that I have written to Mr. Haan. I hope that it may have the effect of enabling you to get speedy action without friction in the future.

"With best wishes, I am yours sincerely,
                        "J. Thomas Heflin."

On February 7, 1922, the defendant replied to Senator Heflin's letter, and inclosed a copy of the letter he had previously written to the Director. The defendant's letter to Senator Heflin is as follows:

"United States Veterans' Bureau,
Washington,

"Office of District Manager, District No. 4.

"In reply refer to: ——

"February 7, 1922.

"The Honorable J. Thomas Heflin, United States Senate, Washington, D. C.—Dear Mr. Heflin: Acknowledging your letter of February 3, I am inclosing herewith a copy of a letter written to the Director in reply to a communication received from Mr. Samuel J. Reed. I regret that Mr. Reed has seen fit to circularize statements concerning this alleged incident. I have made special effort to see that all members of the Fourth District be courteous and sympathetic in their dealing with all ex-service persons, whether they present their own or other cases for adjustment. If you have reference to the communication which Mr. Reed forwarded to several senators, congressmen, and newspapers, I wish to state that a considerable number of his statements concerning discourteous, abrupt, and unfair treatment are substantially incorrect.

"Upon an investigation in the district office, I learn that Mr. Reed has always received very fair consideration, although I can cite instances when the organization which he represents has not been reciprocal and has been almost unreasonable in its demands. As you are aware, the United States Veterans' Bureau is operated under rules and regulations promulgated by the highest authorities, and it is not within the power of a person employed in the execution of these orders to place his own interpretation upon the laws of procedure. The fact that a number of people take offense at opinions adverse to their interest is most unfortunate, although I cannot see how opinions or decisions can be rendered which disregard the statutes and are beyond the facts submitted in a claim.

"I wish to assure you, sir, that a cordial relationship does exist throughout the Fourth District of the Veterans' Bureau; that we have a loyal and efficient group of people, who are putting forth their best efforts toward the care and rehabilitation of the disabled ex-service men. I wish further to state that Mr. Reed and all other persons who are interested in the disabled will receive the best and most courteous treatment which we are capable of.

"I am sincerely yours,

"[Signed]

"Albert E. Haan, District Manager."

The defamatory statements are contained in the defendant's letter to the Director. The mailing of a copy of that letter to, Senator Heflin, as a part of the defendant's reply to the Senator's communication, is the basis of the plaintiff's action. The plaintiff offered in evidence a copy of the letter written by the defendant to the Director of the Veterans' Bureau and the letter addressed to Senator Heflin, both of which were mailed to Senator Heflin by the defendant. It was conceded by both parties that the letters to Senator Heflin were opened and read by Senator Heflin's secretary, and that the Senator was a member of Congress, in the United States Senate from Alabama, at the time the letter was written. Thereupon the plaintiff rested.

The defendant, after testifying that he had received a communication or memorandum from his superior, the Director of the Bureau, requesting an explanation of the matters contained in the affidavit of Mr. Reed, and that it was his duty to reply thereto, offered in evidence the affidavit of Mr. Reed, the letter from Senator Heflin to the defendant, the letter from the Senator to Mr. Reed, together with the testimony of five witnesses, who stated in effect that the general reputation of the plaintiff organization was "not good."

The plaintiff submitted the testimony of one witness to the effect that its reputation was good. No other evidence was submitted, and the learned Chief Justice of the Supreme Court of the District of Columbia directed a verdict for the defendant. The trial court held: First, that the communication was made on a qualifiedly privileged occasion; second, that the plaintiff had failed to offer evidence tending to prove that the defendant was actuated by malice in the publication of the defamatory statements.

[1] The question as to whether the publication of the alleged libelous matter was made upon a privileged occasion was one of law for the court to determine, the facts and circumstances in connection with its publication being undisputed. It is apparent that the occasion upon which the publication was made was not one of absolute privilege. Senator Heflin was not representing any committee of Congress having authority to inquire into the matters referred to in his letter to the defendant. He was acting either as an agent of the plaintiff or upon the individual responsibilities and duties of a United States Senator, and, as such, a member of the legislative branch of the government. The defendant, as an officer in

the Veterans' Bureau, was under no legal obligation to report to Senator Heflin regarding the subject-matter of the inquiry.

Had the action been based upon the original publication of the defamatory words, a different issue would have been presented. The trial court held that the occasion upon which the libelous matter was communicated to Senator Heflin was a qualifiedly privileged one, and we are in accord with that view. Senator Heflin's letter to defendant is susceptible of the interpretation that he was representing plaintiff. The complaint by Reed to the Senator regarding the conduct of the defendant was made as the "National Adjutant" of plaintiff. In his letter to the defendant, Senator Heflin takes occasion to emphasize the fact that the complaint came to him from an officer of plaintiff, which officer " * * * has occasion to take up with you from time to time the cases of disabled soldiers which need adjustment; * * * that it would expedite the settlement of the claims of the soldiers he represents if a more cordial relationship existed. * * * "

It will be noted that Senator Heflin's letter to the defendant is more than a request for an explanation from the defendant, concerning that of which he and plaintiff complain. The character of the language used is such as to convey the thought that there is no doubt as to the truth of the charges made against the defendant, as the Senator concludes his letter with the request that the defendant assure the writer that he will refrain from such conduct in the future.

Does not the language of the Senator's letter indicate that he had an interest in the matter corresponding to that of the defendant? That plaintiff had knowledge of the letter written by the Senator and acquiesced in his action cannot be doubted. On the day he wrote to the defendant, Senator Heflin mailed a copy of that letter to Reed, in care of plaintiff, and at the same time expressed the hope that his letter to the defendant would have the effect desired by the representative of the plaintiff.

We are of the opinion that Senator Heflin was acting as agent for plaintiff to the extent and for the purposes set forth. Senator Heflin, however, had a more important and commanding position than that of mere agent of plaintiff. He was a member of the United States Senate, and may have possessed the moral right to inquire concerning the official conduct of the defendant. In any event, he had an interest, as a member of the legislative branch of the government, in the conduct of the officials of the Veterans' Bureau, and the power to cause the defendant and the Veterans' Bureau considerable trouble, inconvenience, and annoyance, had the defendant failed to reply fully and fairly to the Senator's communication. This must have been known to all the persons concerned. The Senator was, of course, actuated by the highest motives in writing to the defendant, and undoubtedly believed that the representations made by the agent of plaintiff were true, as he clearly indicated in his letter.

[2] We think that the facts and circumstances in this case justify the conclusion that the publication under consideration was procured by the agent of plaintiff; that Senator Heflin had an interest in the subject-matter contained in the publication, corresponding to that of the defendant, and as a member of Congress occupied such a position towards the defendant, as an official in the Veterans' Bureau, as to place the defendant under a moral obligation to defend himself and the bureau, and to reply fully to the charges made against him. Accordingly we conclude that the publication was made upon a qualifiedly privileged occasion. 36 Corpus Juris, §§ 211, 212, 215; White v. Nicholls, 3 How. 266, 286, 11 L. Ed. 591; Newell, Slander and Libel, § 613; Bailey v. Holland, 6 App. Cas. 184, 191.

[3] The occasion upon which the communication was made being such as to rebut the prima facie legal inference of malice arising from the publication of libelous matter, it was necessary for the plaintiff, in order to recover, to prove that the defendant was actuated by express malice in publishing the matter complained of. 36 Corpus Juris, § 167; White v. Nicholls, 3 How. 266, 11 L. Ed. 591.

[4] Express malice may be found from the language itself, as well as from extrinsic evidence, and that question is one for the jury to determine. White v. Nicholls et al., 3 How. 266, 291, 11 L. Ed. 591; Ashford v. Evening Star Publishing Co., 41 App. Cas. 395, 405.

[5] If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial

court to direct a verdict for the defendant. Bacon v. Michigan Central R. Co., 66 Mich. 166, 173, 33 N. W. 181, and cases therein cited; Newell, Slander and Libel (3d Ed.) § 397; Ashford v. Evening Star Newspaper Co., 41 App. Cas. 395, 405. The plaintiff offered no evidence of an extrinsic character tending to prove that the defendant was actuated by malice in the publication of the matters complained of.

[6] It is contended, however, that the question of actual malice was properly brought in issue by the introduction in evidence of the libelous publication. After carefully considering all of the facts and circumstances in connection with the publication of the defamatory matter, as shown by the record, we are of the opinion that the statements complained of were relevant to the subject-matter contained in the charges made against the defendant, and that there is nothing in the communication itself, nor in the circumstances in connection with its publication, from which actual malice might be inferred.

The judgment is affirmed, with costs.

Affirmed.