**ALFRED A. ALTIMONT, INC., a corporation, Appellant,**

v.

**CHATELAIN, SAMPERTON & NOLAN, a partnership, Appellee.**

**CHATELAIN, SAMPERTON & NOLAN, a partnership, Appellant.**

v.

**ALFRED A. ALTIMONT, INC., a corporation, Appellee.**

**Nos. 9879 and 9890.**

District of Columbia Court of Appeals.

Argued Oct. 7, 1976.

Decided May 5, 1977.

---

Clarice R. Feldman, Washington, D.C., with whom William W. Becker and George W. Shaffer, Jr., Washington, D.C., were on the briefs, for appellant in No. 9879 and appellee in No. 9890.

John J. O'Neill, Jr., Washington, D.C., for appellee in No. 9879 and appellant in No. 9890.

Before KELLY and GALLAGHER, Associate Judges, and REILLY, Chief Judge, Retired.

KELLY, Associate Judge:

These appeals are from the resolution by the trial court of disputes between the contractor and the architect who were engaged to build the Union Wesley AME Zion Church of Washington, D.C. They arise in the context of suits by the contractor against the architect for interference with its contractual relations with the church, interference with its business relations with the bonding company, and libel and slander.

Construction of the church building was begun in 1955, but as of 1970 only the foundations and the basement level were complete. In June of 1970, Union Wesley Church (the Church), which had acquired the structure sometime after 1955, decided to proceed with construction of the church sanctuary. To this end it employed the architectural firm of appellee Chatelain, Samperton & Nolan (Chatelain). Chatelain completed the revisions of plans for the church which had been prepared by another architect in October of 1970. Bids from contractors were then solicited and in January 1971, Alfred A. Altimont, Inc. (Altimont), whose bid was the lowest by some $23,000, was awarded the contract. Although the parties to the contract were the Church and Altimont, Chatelain was to see to its performance in all aspects of construction as the designated representative of the Church. Altimont secured the requisite performance bond from Fidelity and Deposit Insurance Company of Maryland (Fidelity), a company with which it had dealt in the past.

Under the terms of the contract, construction was to be completed as close as possible to May 1, 1971. Shortly after work was begun, however, Altimont submitted a revised progress schedule, apparently approved by Chatelain, estimating a completion date of September 30, 1971. Because of a further series of delays the completion date was extended to October 30, but by this time construction work was so far behind schedule that even this deadline was

deemed impossible to meet. The building was still far from completion when, on December 27, 1971, Chatelain sent Fidelity a letter, with a copy to Altimont, in which it expressed its distress at the slow construction progress. The letter said in essence that there were many days when no one was on the job, that Altimont was not promptly and faithfully performing the contract and, indeed, Altimont might be in default thereof. A meeting to rectify matters was suggested. Altimont responded to this letter on December 28, 1971, charging the delays of which Chatelain complained to errors, omissions and changes in the architectural drawings.

Chatelain wrote to Fidelity again on January 3, 1972, this time without sending a copy to Altimont. In the letter Chatelain blamed Altimont for construction delays and ended by saying: "We feel [Altimont] is extremely negligent in [its] duties as a General Contractor." Fidelity acknowledged receipt of both letters on January 6, 1971, stating that its position was the same as that of its principal. At the same time it furnished Altimont with a copy of the Chatelain letter of January 3 to which Altimont wrote a four page response detailing to Chatelain what it considered errors and changes in the architectural drawings. The correspondence prompted a meeting on January 13 at which all parties agreed to cooperate in completing the job as soon as possible. Nevertheless, Mr. John S. Samperton, of Chatelain, said at the meeting he would not retract the statements made in the Chatelain letters and was allegedly heard to remark to others after the meeting that he thought Altimont should get out of the construction business. It is this statement and the letters of December 27 and January 3 which constitute the alleged defamation.

Affairs did not improve and the construction work was not completed. In June of 1972, Altimont submitted to the Church claims for extra costs caused by delays. The claims were disputed, so Altimont requested arbitration in accordance with the terms of the contract. While the arbitrator subsequently awarded Altimont $34,650 for delays, it is not clear on this record whether the Church ever paid the award. What is clear is that the disputes and delays continued. In November or December of 1972, Altimont submitted to the Church a list of subcontractors to whom a total of $60,556.63 was owed. When the Church refused to pay this claimed indebtedness, Altimont walked off the job. The Church employed another contractor to complete construction.

Meanwhile, Altimont had begun a series of lawsuits. The first, filed against Chatelain in June of 1972, was for libel, slander, and interference with Altimont's business relations with Fidelity and other bonding companies.[1] The second, filed in March 1974, alleged an intentional or malicious interference with Altimont's contract with the Church. In the latter suit Chatelain counterclaimed for malicious abuse of process and negligence.[2] The two actions were consolidated for trial and after seven days of trial before a jury, the court granted Chatelain's motion for a directed verdict on all of Altimont's claims and also directed a verdict against Chatelain on its counterclaims.

## I.

We first address Altimont's contention that it was error to consolidate the actions for trial,[3] recognizing as we do so that a question of consolidation is a decision

1. The initial complaint for libel and slander was amended to include counts for invasion of privacy (dropped at trial) and interference with business relations.

2. Altimont also filed suit for breach of contract against the Church in the federal district court. That case does not bear on this appeal.

3. Super.Ct.Civ.R. 42(a) states:

CONSOLIDATION. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

in which the court has great latitude and that its ruling thereon is not to be disturbed on appeal except for an abuse of discretion.[4] *Dupont v. Southern Pacific Company,* 366 F.2d 193 (5th Cir. 1966); *Whiteman v. Pitrie,* 220 F.2d 914 (5th Cir. 1955). No such abuse is present here.

■ Altimont concedes that common questions of law and fact appear in both causes of action since both arise from the same set of circumstances, *i. e.,* the building of the church and the disputes over who was to be charged for the many delays. Additionally, it was clear that trial on the three counts would include much of the same evidence, and the same witnesses and testimony, especially since a defense of privilege is raised as to each count. Consolidation therefore avoids duplication in potentially lengthy trials. Consolidation was not improper simply because in each case some questions of law or fact might be different, and neither the fact that the jury might possibly be confused by instructions necessitated by consolidation nor the fact that the two cases were in disparate stages of trial preparation outweighed the obvious advantages of trying the cases together. The order of consolidation was clearly a proper exercise of the court's discretion.

## II.

■ In order to recover for inducement of breach of contract, four things must be proven: (1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach. *Hunter Vending Company v. D.C. Vending Co., Inc.,* D.C.App., 345 A.2d 142, 143 (1975). Once a prima facie case has been established liability may still be avoided if the defendant can establish that his conduct was legally justified or privileged. *Deoudes v. G.B. Macke Corporation,* D.C. Mun.App., 153 A.2d 309 (1959); *Meyer v. Washington Times Co.,* 64 App.D.C. 218, 76

F.2d 988, *cert. denied,* 295 U.S. 734, 55 S.Ct. 646, 79 L.Ed. 1682 (1935); Prosser, Torts § 129 (4th ed. 1971).

■ The trial judge's ruling that Altimont had failed to establish a prima facie case of interference with contractual relations is correct. Examination of the record reveals no evidence that Chatelain intentionally induced the Church to breach its contract with Altimont even assuming that the Church was the party in breach.[5] On the contrary, the only evidence on the cause of the breach is that in November or December of 1972, Altimont submitted to the Church a list of amounts owed to various subcontractors totalling $60,556.63. The Church refused to pay, contending that it had already given Altimont the money to satisfy its obligations to the subcontractors. Altimont, in turn, refused to continue work until these amounts were paid and so, on December 17, 1972, walked off the job. A later demand by Altimont for an extra $1,000 per week to finish the job was declined by the Church. Whether or not the Church would have been paying twice if it paid the amounts on the December list, there is no evidence that Chatelain intentionally or otherwise induced the Church not to pay. Thus, there being insufficient evidence to create an issue of fact for the jury on the crucial third element, the court correctly directed a verdict on this count.

## III.

The letters of December 27, 1971 and January 3, 1972, underpin Altimont's claim that Chatelain tortiously interfered with its business relations with Fidelity and other bonding companies. The result of this interference allegedly has been Altimont's inability to obtain bonding, thus driving it out of the construction business. Altimont contends that the court erred in directing a verdict on this count on the premise that there was insufficient evidence that Alti-

---

4. As the Superior Court rule is identical to Fed.R.Civ.P. 42(a), federal cases are authority in interpreting the rule. *Campbell v. United States,* D.C.App., 295 A.2d 498, 501 (1972).

5. As we hold that Altimont did not make out a prima facie case, we need not discuss Chatelain's defense of privilege.

mont was damaged by Chatelain's intentional, unjustified interference with its business relations to raise an issue for the jury. It contends also that the trial judge appears to have erroneously based direction of the verdict on the ground that there can be no recovery for interference with *prospective* as opposed to existing business relations.

 Contrary to the court's conception of the law, recovery may be had for interference with prospective advantage. To establish a prima facie case of interference with business relations, however, a plaintiff must show that the interference was intentional and that there was resulting damage. Prosser, Torts § 130 (4th ed. 1971). A defendant can avoid liability if he establishes that the interference is privileged. *Zoby v. American Fidelity Company*, 242 F.2d 76 (4th Cir. 1957). The trial court apparently considered that Chatelain's letters were qualifiedly privileged, but we need not resolve this issue in view of our holding that Altimont failed to establish a prima facie case of interference with business relations.

Altimont argues vigorously that there was evidence that the disputed letters were the cause of his inability to obtain bonding. The record shows, however, that although the letters may have been a factor in later refusals by some companies to bond Altimont, most rejections occurred before the letters were even written. The bond for the church construction was written in January of 1971. In March of 1971, the local branch office of Fidelity received a memorandum from the home office that it was to write no more bonds for Altimont because of Altimont's background and the inaccuracy of its current financial reports.

Altimont alleges, without support in the record, that the actual formal stop order was not issued until July 20, 1971, implying thereby that the Church caused the stop order to issue. It points out that despite the March memorandum, Fidelity bonded it again in May of 1971. Mr. Joseph Burke, agent for Fidelity, explained however, that the bond was written only because Fidelity had given Altimont a bid bond on another church project before receiving the memorandum. Since a bid bond guarantees that if the contractor gets the job the bonding company will write the performance bond, Fidelity felt obligated to write the performance bond when Altimont was in fact awarded the contract.

Whether the actual stop order issued in March or July, however, it is clear that Chatelain's letters of December 1971 and January 1972 were not factors in Fidelity's decision to cease bonding Altimont.

As to Altimont's ability to obtain bonding from other companies, the last performance bond Altimont obtained was dated December 7, 1971 from the St. Paul Fire and Marine Insurance Company. Mr. Joseph Clark, an independent bonding agent who acts as a broker between bonding companies and contractors, testified that St. Paul decided between September 1971, when they wrote the bid bond, and December of that year that they would write no further bonds for Altimont. He said that this decision was made on the basis of Altimont's financial record and also testified that he was unsuccessful in other attempts to obtain bonding for Altimont because of Altimont's previous history and because some companies thought the Altimont account too small. He did say that it would hurt a contractor's bonding ability to have letters such as the ones written by Chatelain in his file, but there was no evidence that these letters were the basis for any refusals.

Mr. William Haggerty, also an independent insurance agent, testified that the last bond written through his company for Altimont was the May 1971 bond with Fidelity. Although Altimont left Haggerty's firm for Clark's firm in November 1971, Haggerty did try, unsuccessfully, to obtain bonding for Altimont after publication of the letters. Only one bonding company even responded to his inquiries and its response was negative. The company had copies of the letters, but Haggerty said that the Union Church job was the reason for the refusal above and beyond the letters.

■ In view of Altimont's inability to obtain bonding before publication of the letters, Haggerty's testimony is insufficient evidence of damage to create a factual issue for the jury. Most decisions not to bond Altimont were made before the letters were written and were based on past history and financial background. There is no evidence that either of these factors changed so as to permit attribution of subsequent rejections to the Chatelain letters; consequently, there was insufficient evidence that the letters damaged Altimont's business relations either with Fidelity or other bonding companies to permit the issue of liability on this count to go to the jury.

## IV.

The trial judge directed the verdict on the libel and slander counts because he found that as a matter of law the communications were qualifiedly privileged and Altimont had produced insufficient evidence of malice to submit the question of liability to the jury.

■ Whether or not a communication is privileged is a question of law for the court. *Fisher v. Washington Post Company,* D.C.App., 212 A.2d 335 (1965); *Manbeck v. Ostrowski,* 128 U.S.App.D.C. 1, 384 F.2d 970, *cert. denied,* 390 U.S. 966, 88 S.Ct. 1077, 19 L.Ed.2d 1170 (1967). It is not contested here, however, that the communications in question fall within the qualified privilege broadly described as follows:

> An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know. [Restatement of Torts § 596.]

Such a privilege is recognized in this jurisdiction. *Brown v. Collins,* 131 U.S.App.D.C. 68, 402 F.2d 209 (1968);[6] *Blake v. Trainer,* 79 U.S.App.D.C. 360, 148 F.2d 10 (1945). As in the case of any qualified privilege, how-

ever, if the writer/speaker acts with malice, the privilege is lost. But once it is decided that the communication is privileged, the burden is on the plaintiff to prove the privilege has been abused. *Potts v. Dies,* 77 U.S.App.D.C. 92, 132 F.2d 734 (1942), *cert. denied,* 319 U.S. 762, 63 S.Ct. 1316, 87 L.Ed. 1713 (1943).

■ In the context of defamation, malice means basically that the publisher acted in bad faith, *H.E. Crawford Co. v. Dun & Bradstreet, Inc.,* 241 F.2d 387, 395 (4th Cir. 1957), which is described as

> the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will. [*Dun & Bradstreet, Inc. v. Robinson,* 233 Ark. 168, 345 S.W.2d 34, 38 (1961).]

Put another way, a qualified privilege exists only if the publisher believes, with reasonable grounds, that his statement is true. *Afro-American Publishing Co., Inc. v. Jaffe,* 125 U.S.App.D.C. 70, 77, 366 F.2d 649, 656 (1966). Additionally, the existence of malice is ordinarily a factual issue for the jury. *Manbeck v. Ostrowski, supra.* The court may direct a verdict for the defendant only if it determines that insufficient evidence has been presented to raise such an issue. *See, e. g., May Department Stores Company, Inc. v. Devercelli,* D.C.App., 314 A.2d 767 (1973); *Fisher v. Washington Post Company, supra.*

■ This court recently addressed the issues of malice and qualified privilege in the context of evidence sufficient to send the issue to the jury. *Ford Motor Credit Company v. Holland,* D.C.App., 367 A.2d 1311 (1977). Certain general principles are accepted. There must be more than speculation and innuendo. *Fisher v. Washington Post Company, supra.* The fact that the publisher is inspired in part by resentment or indignation does not defeat the privilege as long as the communication is otherwise

---

**6.** The court in *Brown v. Collins, supra,* said: "[T]he rule [is] that persons who have shared interests are conditionally privileged to utter defamation on matters related to that interest." *Id.* at 71, 402 F.2d at 212.

justified, *i. e.*, made to protect an interest. *Manbeck v. Ostrowski, supra.* However, when the publisher acts either with knowledge that the statements are false or with a reckless disregard for their truth, malice may be inferred. *See, e. g., Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F.Supp. 421 (D.D.C.1972). But if

the language of the communication, and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant. [*National Disabled Soldiers' League, Inc. v. Haan,* 55 App.D.C. 243, 248–49, 4 F.2d 436, 441–42 (1925).]

Altimont contends that from the evidence it would be reasonable for the jury to conclude that the substantial construction delays were caused by errors, omissions and changes in the architectural drawings, and that Chatelain's letters were written not only to hide this fact, but also to lay the entire blame for delay on Altimont. Thus the jury would be justified in finding that Chatelain acted with malice in writing the letters. On the contrary, we think it clear that Chatelain acted in good faith and within the scope of its duty to the Church in communicating with the bonding company.

 As to its duty under the terms of the contract between Altimont and the Church, Chatelain was to be the Church's representative or agent during construction and until final payment. Chatelain thus had a duty to protect the interest of its principal in dealings with all the parties. *See John W. Johnson, Inc. v. Basic Construction Co., Inc.,* 292 F.Supp. 300 (D.D.C. 1968); *Lundgren v. Freeman,* 307 F.2d 104 (9th Cir. 1962).

From the testimony of the architects, the bonding agents and Fidelity it appears that in the construction industry the common practice is for bonding companies to inquire about the status of jobs for which they are providing the performance bonds.[7] These inquiries are made of the owner or to his representative, the architect. It is less common for the architect to offer unsolicited information, but Mr. Leon Chatelain testified that he recalled doing so on previous occasions when there was a good possibility the bonding company would be required to pay. He also testified that he considered it the duty of the architect to write such letters to bonding companies, whether solicited or not, so as to keep them abreast of the progress on a job. He also stated that when the likelihood of the bonding company having to pay increases, the duty of the architect to keep it informed increases.

Samperton, the partner at Chatelain who was closely involved in the Union Wesley project, was the author of the letters in question. He stated repeatedly and emphatically at trial that he had written the letters out of what he considered his duty to protect his client's interest. At the January 13, 1972 meeting he refused to retract the letters because he felt that their contents were true and that he had a right to speak the truth to protect his client.

As to good faith, the issue is whether there were reasonable grounds to believe that Altimont caused the delays by negligence in construction of the church and was thereby in default under the terms of the contract.

All witnesses at trial conceded that many changes were made in the construction plans. Most, however, originated with the Church, not Chatelain, and were due not to errors or omissions in the drawings but to conditions on the job site or a change of taste on the part of the Church. Altimont's testimony was that many such changes in plans are encountered during the course of a construction project.

Under the terms of the contract, the architect had the authority to require minor changes in construction without requiring adjustment to the contract sum. For other

7. There were in fact two such formal inquiries made in respect to the Church project dated February 22 and August 10, 1972.

**292**

changes originating with either the owner or the architect the contractor was entitled to make a claim for extra costs within 20 days of the event giving rise to the claim. Altimont admitted on cross-examination that (1) no claims for changes had been made within 20 days, and (2) that the Church had paid for extra costs incurred by changes in accordance with the contract.

Under similar contractual provisions relating to delays caused by either the architect or owner's acts or neglect, the contractor could file claims for extensions of time and additional costs within 20 days of the event causing the delay, lacking which the claims would be waived. Altimont admitted that no such claim was filed until January 1972, after the disputed letters were sent.

There are examples of record of arguable contractor negligence. Altimont admitted, for example, that on many days no one was working on the job, that workers drank on the job, that a full crew was not kept at the site, that contrary to the contract there was an unqualified supervisor in charge of the job for some period of time, that a log book or schedule, as is usual on a project, was not kept and that as the building was not watertight as required by the contract, water damage resulted.

On the other hand, Altimont produced nothing other than allegations to show that Chatelain, through Samperton, was acting either beyond the scope of his duty to the Church or in bad faith.

Under the standards discussed above for finding the evidence sufficient to submit to the jury it is not enough that Chatelain undoubtedly felt antagonistic and resentful towards Altimont. *Manbeck v. Ostrowski, supra.* In our view the evidence here is at most as consistent with the non-existence of malice as it is with the existence thereof. In accordance with the law as established in *Ford Motor Credit Company v. Holland, supra; May Department Stores Company, Inc. v. Devercelli, supra;*

and *National Disabled Soldiers' League, Inc. v. Haan, supra,* we therefore hold that direction of the verdict was proper as a matter of law.[8]

*Affirmed.*

---

8. Because of our disposition of this case we need not address Chatelain's protective cross-appeal.