J.W. KAEMPFER, Jr., et al., Plaintiffs,

v.

Philip J. BROWN, et al., Defendants.

Civ. A. No. 87–50.

United States District Court,
District of Columbia.

Jan. 10, 1990.

Robert P. Trout, Stephen A. Bogorad, Robert O. Duvall, Dunnells, Duvall, Bennett & Porter, Washington, D.C., for plaintiffs.

J. Andrew Chopivsky, Nicholas A. Addams, Washington, D.C., for defendants.

Peter R. Kolker, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., for trustee.

William P. Dale, Robert W. McChesney, Jr., McChesney, Duncan & Dale, Washington, D.C., for estate.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This action was transferred from the United States Bankruptcy Court on January 6, 1987. It is only one of a continuing series of legal proceedings relating to the development of a commercial property located at 1250 24th Street, N.W., Washington, D.C. by J.W. Kaempfer and affiliated groups.[1] Plaintiffs seek declaratory and injunctive relief that their purchase of a 37.5% interest in the 1250 24th Street property, previously owned by Loretto Brown, a decedent of the defendants, was proper in all respects. Defendants,[2] who own the remaining interest in the property, attempted to purchase the 37.5% interest without success. In their answer, defendants assert counterclaims against plaintiffs of tortious interference with a contractual right and intentional interference with a business opportunity or expectancy. This action comes before the court on cross motions for summary judgment. Upon consideration of the extensive and exhaustive briefs, and review of the entire lengthy record, we conclude that the purchase of the 37.5% interest by the plaintiffs was valid in all respects, and therefore grant plaintiffs' motion for summary judgment on the Complaint and all counts of the Counterclaims asserted by the defendants.

### Background

The origin of this dispute took place more than ten years ago. On October 10, 1979, the defendants entered into an agreement to lease Loretto Brown's 37.5% interest in the family's property at 1250 24th Street for as long as Loretto Brown lived ("the Lease").[3] Upon Loretto Brown's death, the Brown family had the right under the lease to purchase Loretto Brown's interest from the estate within a six month period. According to the Lease, the defendants had

> an irrevocable option ... to purchase her entire interest in said property within 6 months of her death and Loretto Brown's Estate irrevocably shall sell said entire interest in said property to said Brown Group within 6 months of Loretto Brown's death, and said Brown Group irrevocably agrees to purchase from Loretto Brown's estate said entire interest within said 6–month period.

The Lease further provided the formula for computing the purchase price upon Loretto Brown's death. In addition to the specification of a six month time period for purchase by the defendants, Section 5(b) of the Loretto Brown Lease most importantly required that "the Brown Group shall pay Loretto Brown's estate all cash" at settlement.

On December 22, 1981, two years later and while Loretto Brown was still alive, the Browns and their company, B & W Management, filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. John W. Guinee, Jr. was appointed Trustee. As part of the Amended Plan of Arrangement, ("the Plan"), approved by the Bankruptcy Court in 1983, defendants entered into a Stock Purchase Agreement with the Kaempfer Company. Under Section 7(d) of the Stock Purchase Agreement dated March 31, 1983, the Kaempfer Company was irrevocably assigned the right to purchase the Loretto Brown interest for the final thirty days of the six month period after Loretto Brown's death, if the Brown Group did not purchase it before.

Loretto Brown died on March 28, 1986. Under the terms of the 1979 and 1981 agreements, the defendants had the irrev-

---

**1.** Other actions before the court involving the same parties are: *In re B & W Management, Inc.,* C.A. No. 88–952; *In re B & W Management Inc.,* C.A. No. 89–2330; *In re Philip Joseph Brown,* C.A. No. 89–2331; and *In re William John Brown,* C.A. No. 89–2332.

**2.** The term "Defendants" will hereinafter be used to refer to the debtor-defendants only. They are William Brown, Philip Brown and B & W Management. John Guinee, Jr., trustee in

bankruptcy for the debtor-defendants, will be referred to as "Trustee", although he is also a defendant in this action.

**3.** The events leading to the Loretto Brown Lease are discussed in *Brown v. Carr,* 503 A.2d 1241, 1246–47 (D.C.1986) (suit for malicious persecution and intentional interference with a prospective business advantage).

ocable right to purchase the 37.5% interest until August 29, 1986, at which time the Kaempfer Company would have the irrevocable right to purchase the property interest for the following thirty days if the Browns were unable to consummate the purchase.

The claims raised in this adversary proceeding arise from the unsuccessful efforts of the defendants to exercise their rights to purchase the Loretto Brown interest on or before August 29, 1986 and from the plaintiffs' exercise of their rights under the Plan when the defendants were unable to secure financing for the "cash" required for purchase within the time specified in the Lease.

Despite the requirement of "cash" the defendants first suggested that the Loretto Brown Estate finance the purchase of the Loretto Brown interest through a promissory note or a deed of trust. For obvious reasons, the Estate rejected the proposal on June 6, 1986, reiterating the requirement of a full cash payment at settlement. The defendants and the Trustee then began to seek financing for the purchase, pursuing, at various times, loans from Sovran Bank and Ralph D. Kaiser Co., Inc. As the August 29, 1986 date approached, defendants sought to delay the assignment of the right to purchase to the Kaempfer plaintiffs by moving the Honorable Judge Bostetter of the United States Bankruptcy Court for a standstill order. Judge Bostetter denied the request on August 28, 1986. (Transcript of August 28, 1986 telephonic hearing at Vol. 2, pp. 2–3).

On August 29, 1986, the last day on which defendants had the right to purchase the Loretto Brown interest, a purported settlement was held by the defendants. They offered the settlement agent a check for $2 million drawn on the "Ralph D. Kaiser Co., Inc., Escrow Account" at Madison National Bank. The check was not certified. As security for the Kaiser loan, Philip Brown had pledged his interest in property at 1222 22nd Street, N.W., Washington, D.C. At the time of the closing, the title report on the 1222 22nd Street property had not even been completed. Upon the

request of Robert W. McChesney, counsel to the Estate of Loretto Brown, Madison National Bank was called to determine the immediate availability of funds in the account. The parties were informed that Kaiser had left instructions that the check could not be released or negotiated until he (Kaiser) had reviewed and approved the loan documents. (Affidavit of Robert W. McChesney, Jr., (September 5, 1986)). After a further discussion with Madison National Bank, McChesney stated that the restrictions placed on the release of the check rendered it non-negotiable, therefore not fulfilling the requirement of the Loretto Brown Lease that payment be in "all cash". The Loretto Brown Estate determined that defendants had failed to discharge their obligations to purchase the interest within the time period specified. Thus, according to the Stock Purchase Agreement, the right to purchase the interest was irrevocably vested in the Kaempfer Company.

On September 3, 1986, Kaempfer Company transferred its previously acquired right to purchase the property interest to 1250 Twenty–Fourth Street Associates Limited Partnership ("Associates"), which then purchased the property interest by tendering $1.8 million in cash to the Estate of Loretto Brown.

Plaintiffs J.W. Kaempfer, Jr., The Kaempfer Company, 1250 Twenty–Fourth Street Associates Limited Partnership and 1250 24th Street Land Associates Limited Partnership ("Land Partnership") (hereinafter referred to collectively as "the Kaempfer plaintiffs") and the Estate of Loretto Brown ("the Estate") then brought the present suit for a declaratory judgment that the purchase of the property interest was valid and effective, and that defendants be prohibited from challenging or interfering with plaintiffs' ownership of the 37.5% property interest.

Defendants, as part of their response, filed a three-count counterclaim alleging that the Kaempfer plaintiffs (1) tortiously "sabotaged and interfered with" the Browns' contract with the Estate of Loretto Brown (Count I); and (2) tortiously inter-

fered with the Brown's business expectancies in purchasing the Loretto Brown interest (Count II) by interfering with the defendants' attempts to arrange financing and purchase the interest within the time permitted.[4] Count III of the Counterclaim, directed solely against the Estate, alleges that the Estate wrongfully accepted $1.8 million from the Kaempfer plaintiffs knowing the proper price was $1.4 million for the Loretto Brown interest, thereby damaging the Brown Group in the amount of $450,000. In addition, the defendants seek damages arising out of the transaction or, in the alternative, an order directing the plaintiffs to deed the property back to the Estate with additional time provided for defendants to raise the funds necessary for its purchase. The Kaempfer plaintiffs move for summary judgment on Counts I and II of the Counterclaim and on the Complaint. The Estate moves for summary judgment on Counts II and III of the Counterclaim and the Complaint. It is this precise issue which we are required to address.

In what has been the defendants' pattern for this litigation, they have filed a continuous series of delaying and repetitive motions in this and several other cases before us.[5] We have dealt with each motion in turn, but as we found in *Kaempfer v. Brown*, 684 F.Supp. 319 (D.D.C.1988), *aff'd without opinion*, 872 F.2d 496 (D.C.Cir. 1989) (where litigant acts in bad faith, or with harassive purpose, order enjoining future suits without approval is both appropriate and necessary), we are convinced "that the purpose of many of these motions was not, as defendants assert, to vigorously promote their legal rights, but rather to 'torpedo' the 1250 24th Street project, or to make plaintiffs' efforts to develop the property as costly and burdensome as possible." *Id.*, at 324–25. Having previously considered these "myriad of motions," a majority of which "have simply lacked merit", *id.* at 324, we finally reach the underlying issue, the validity of the plaintiffs' purchase of the 37.5% Loretto Brown interest.

### Discussion

The counterclaims asserted against the Kaempfer plaintiffs and the Estate arise from the sale of the Loretto Brown interest by the Estate to the Kaempfer plaintiffs. The counterclaims alleged are the torts of interference with contractual rights and interference with business opportunity or expectancy. Each of these claims fails as a matter of law based on the facts alleged in the counterclaims. They are completely without merit.

### I. *Tortious Interference with Contractual Rights*

To recover on the theory of wrongful inducement of a breach of contract, it is well settled that the defendants "must show (1) a contract; (2) knowledge of the contract; (3) intentional procurement of its breach ...; and (4) damages resulting from the breach." *Tuxedo Contractors, Inc. v. Swindell–Dressler*, 613 F.2d 1159, 1162 (D.C.Cir.1979) (quoting *Hunter Vending Co. v. D.C. Vending Co.*, 345 A.2d 142, 143 (D.C.App.1975); *accord, Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 288 (D.C.App.1965); *Dunn v. Cox*, 163 A.2d 609, 611 (D.C.Mun.App.1960). We agree that proof exists as to the first element of the cause of action, namely a valid contract between the Estate of Loretto Brown and the defendants for the purchase of the Loretto Brown interest. However, to establish interference with a contract, a party must prove, among the other elements, a breach of an existing contract. *Altimont,*

---

**4.** Defendants also named American Security Bank, the construction lender, and Robert W. McChesney, Jr. Esq., counsel to the Estate of Loretto Brown, as counterclaim defendants. This Court dismissed the claims against these counterclaimants on June 2, 1987. (Order of June 2, 1987). Defendants filed an almost identical suit in Superior Court for the District of Columbia. American Security Bank moved to enjoin the Superior Court action and future suits against it by the defendants, without prior approval of this Court. This motion was granted in *Kaempfer v. Brown*, 684 F.Supp. 319 (D.D.C.1988), *aff'd without opinion, Kaempfer v. Brown*, 872 F.2d 496 (D.C.Cir.1989).

**5.** In this case alone there are more than eighty (80) separate docket entries.

*Inc. v. Chatelain,* 374 A.2d at 288. In the instant case, no breach has occurred. It is not in dispute that the Loretto Brown lease required the transfer of the property interest to defendants within six months of the death of Loretto Brown, if all conditions were met, nor that the defendants entered into a Stock Purchase Agreement with the Kaempfer plaintiffs, assigning to them the right to purchase the Estate's interest in the final month of the six month term. Accordingly, under the terms of the Stock Purchase Agreement, the defendants' right to purchase ended on August 29, 1986 and Kaempfer's right to purchase the interest began on August 30, 1986, ending on September 30, 1986.

The Estate had no role in the Stock Purchase Agreement but was contractually bound by the assignment to sell the interest to the Kaempfer plaintiffs if it remained unsold after August 29, 1986.

The defendants' failure to acquire the interest was solely the result of their own actions. The defendants had five months from the date of Loretto Brown's death to arrange financing for the purchase. They were on notice that the Estate would require "all cash" by the express terms of the agreement. Instead, the defendants waited until the last possible day prior to the expiration of the specified time period for the purchase. It was incumbent upon them to come prepared with sufficient "cash". The defendants came not with cash but with a non-certified check representing the potential proceeds of a loan which had not closed and could not close because conditions precedent to the loan closing had not occurred. In the Counterclaim, defendants admit that on August 29, 1986, they did not yet have the stock collateral and title documents required for approval of the Kaiser loan agreement. *See* Counterclaim, ¶¶ 47, 48.

The Lease established a clear time frame for completion of the purchase by the defendants. Defendants could not fulfill the contract by stating that they were willing to purchase the interest on August 29, 1986 but would not be able to pay the purchase price until sometime in the future. *See Odyssey Glass Corp. v. Simenaur,* 47 Md. App. 645, 425 A.2d 249 (1981) (optionee did not properly exercise option to purchase property for a specified amount "all cash" prior to a date certain when optionee only indicated desire to purchase and placed deposit prior to date); *Annot.,* 71 A.L.R.3d 1201, 1240 (1976) (when option agreement requires payment of purchase price prior to date certain, optionee must tender purchase price within option period).

There is no dispute that August 29, 1986 was the last day for purchase by the defendants before the irrevocable assignment of the right of purchase to the Kaempfer plaintiffs. However, the defendants' position is that their tender of a financial lender's check in the ordinary course of business satisfied the requirement of "all cash". This claim borders on the frivolous. Defendants argue that the check, although not certified, represented cash, citing only a Minnesota case as authority. *Southgate, Inc. v. Ecklin,* 296 Minn. 502, 207 N.W.2d 729 (1973). This citation is completely inapposite. In that case the purchaser presented a personal check for the purchase of real estate. The court held that the tender of a personal check in the ordinary course of business for the purchase of real estate was sufficient, since the evidence showed the check would be honored. In the instant case, the evidence shows just the opposite. When questioned as to the availability of funds to support the check, the bank disclosed that restrictions had been placed upon its release. Because of these restrictions, the check was not only not "all cash" as required by the Lease, but it was not even a negotiable instrument, since it was not "payable on demand or at a definite time." D.C.Code Ann. § 28:3–104(1)(c) (1981).[6] If the defendants had presented a

---

6. D.C.Code Ann. § 28:3–104(1) reads:
   (1) Any writing to be a negotiable instrument within this article must
      (a) be signed by a maker or drawer; and

   (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article; and

cashier's check at the time of the attempted purchase, it is well established that a cashier's check as a negotiable instrument would have been the equivalent of cash. *See Da Silva v. Sanders,* 600 F.Supp. 1008 (D.D.C.1984). The Estate was not required to assume the risk when the defendants arrived at the closing with a non-certified check which the bank could not confirm was backed by sufficient funds and which lender stated could not be tendered to the Estate because loan documents had not been approved. We find that the Estate did not breach the contract when it refused to go forward with the sale because of imperfect tender. Therefore, the requisite elements of both a breach of contract by the Estate and inducement of this breach by the Kaempfer plaintiffs are lacking. *See Hunter Vending Company v. D.C. Vending Co., Inc.,* 345 A.2d at 143.

## II. *Intentional Interference with Business Expectancy*

■ The defendants' allegations likewise do not offer sufficient support for a claim of intentional interference with a business opportunity or expectancy.

■ The elements of the tort of intentional interference with business expectancies run parallel to that of interference with existing contracts. *See Brown v. Carr,* 503 A.2d 1241, 1247 (D.C.1986); *De Kine v. District of Columbia,* 422 A.2d 981, 988 (D.C.1980) (tort falls under the same rubric as interference with contractual relations) (citation omitted). To establish a *prima facie* case of interference with business relations, a party "must show that the interference was intentional and that there was resulting damage." *Altimont,*

*Inc. v. Chatelain,* 374 A.2d at 289; W. Prosser, *Torts* § 130 (4th ed. 1971). The defendants have claimed that the Estate of Loretto Brown interfered with the defendants' business expectancies (Counterclaim Count II). Although it is not clear, we assume defendants are claiming that the Estate interfered with their business interests by not selling the 37.5% Loretto Brown interest to them at the purported settlement on August 29, 1986. We find no evidence that the Estate interfered with any legitimate business interest of defendants as claimed. The Estate gave the defendants every opportunity to comply with the terms of the Loretto Brown Agreement. The defendants' inability to arrange financing was due to their own delays and interference with the Trustee's attempts to negotiate a loan agreement within the time period clearly set.[7] When the terms of the Agreement were not fulfilled by August 29, 1986, the Estate was obligated under the terms of the defendants' own assignment to convey the Loretto Brown interest in the property to the Kaempfer plaintiffs. We turn now to defendants' claim of interference by the Kaempfer plaintiffs.

As support for the claim of intentional interference with a prospective business advantage against the Kaempfer plaintiffs, defendants point to the appearance of attorneys for the Kaempfer plaintiffs and American Security Bank, construction lender for the Kaempfer Company, at the purported settlement. Again, defendants' position is frivolous. We do not find it strange or unusual that parties involved in a 99 year ground lease would attend a possible sale of a substantial interest in

(c) be payable on demand or at a definite time; and
(d) be payable to order or to bearer.

7. Defendants' earlier counterclaim against Robert McChesney, Counsel to the Estate, of tortious interference with defendants' business opportunity, based on the same allegations, was dismissed by this Court on June 2, 1987 (Order of June 2, 1987). At that time, we held that the insistence of Robert McChesney, as counsel to the Estate, on a cash purchase in accordance with the terms of the Agreement, did not constitute tortious interference with the defendants'

contractual rights or business opportunities. *Id.* at 7. Further, McChesney's advice to his client, the Estate, was held to be "clearly privileged and well within the scope of his fiduciary relationship with the Estate." *See Los Angeles Airways Inc. v. Davis,* 687 F.2d 321 (9th Cir.1982). *Id.* Upon consideration of defendants' identical allegations as the instant case, we held that McChesney "gave honest advice (not to accept the offered check) which is not improper interference with the Browns' business opportunities." R.2d Torts §§ 770, 772 *Id.*

that property. The Kaempfer plaintiffs acted to protect their own financial interests. The alleged conduct was justified and requires no explanation or defense. Liability for intentional interference with a business opportunity can be avoided if the party also establishes that the interference is privileged. *Zoby v. American Fidelity Company*, 242 F.2d 76 (4th Cir.1957) (where alleged interferer is a financially interested party and such interest motivates his conduct, it cannot be said that he is an officious or malicious intermeddler); Restatement 2d Torts § 769. *See Brown v. Carr*, 503 A.2d 1241, 1247 (D.C.App. 1986) (although court does not reach the issue of privilege, it notes that financial interest in purchasing property may privilege such conduct). However, because we find that the defendants, despite their excessive rhetoric, have failed to establish a *prima facie* case of interference with business expectancies, we need not rule on the issue of privilege. We turn now to Counterclaim Count III.

### III. *Counterclaim Count III*

Finally, defendants have claimed in Count III of the Counterclaim that the Estate wrongfully accepted an improper price of $1.8 million for the interest in the property, knowing the proper price was $1.4, thereby injuring the defendants. This claim merits little discussion, since the defendants themselves admitted to the court that the purchase price which was to be used if the settlement of August 29, 1986 had gone forward was $1.8 million. (*See, Defendant's Motion for Reconsideration of Court's Memorandum Order of June 2, 1987* at page 6.) If defendants agreed that the appropriate price for the property was $1.8 million if they had successfully purchased it, they cannot now argue that the Estate acted wrongfully in selling the interest to the Kaempfer plaintiffs at that same price.

While it probably is a sanguine expectation, we voice the hope that defendants in this longstanding dispute may recognize the waste of their own as well as judicial resources in this continued litigation. Defendants' previous counsel consistently abused the judicial process with no success. Perhaps present counsel will profit from this experience.

An order consistent with the foregoing has been entered this day.

### ORDER

Upon consideration of the motions for summary judgment filed by J.W. Kaempfer, Jr., The Kaempfer Company, 1250 Twenty–Fourth Street Associates Limited Partnership ("Associates"), and 1250 24th Street Land Associates Limited Partnership ("Land Partnership"), (collectively, the "Kaempfer plaintiffs"), and the Estate of Loretto Brown, the opposition thereto, and the entire record herein, and for the reasons stated in the accompanying Memorandum Opinion filed this day, it is by the Court this 9th day of January, 1990,

ORDERED that the motion for summary judgment of the Kaempfer plaintiffs be granted; it is

ORDERED that the motion for summary judgment of the Estate of Loretto Brown be granted; it is

ORDERED that it is hereby declared that the transfer of the 37.5% interest from the Estate of Loretto Brown to the Kaempfer plaintiffs was valid and proper in all respects; it is

ORDERED that the counterclaims filed by defendants against the Estate of Loretto Brown and the Kaempfer plaintiffs be dismissed with prejudice; and it is

FURTHER ORDERED that the defendants are permanently enjoined from filing any claims or liens or taking any steps to interfere with the ownership by the Kaempfer plaintiffs of the 37.5% interest formerly owned by the Estate of Loretto Brown.