**EDMONDSON AND GALLAGHER, et al., Plaintiffs**

v.

**ALBAN TOWERS TENANTS ASSOCIATION, et al., Defendants.**

**Civ. A. No. 93–1090.**

United States District Court, District of Columbia.

July 30, 1993.

---

David John Branson, Daniel J. Culhane, Kaye, Schlor, Fierman, Hays & Handler, Washington, DC, for plaintiffs.

James B. Rosenthal, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This action is before the Court after being removed from the District of Columbia Superior Court. The complaint was brought by Edmondson & Gallagher ("E & G"), a Virginia real estate company, against the Alban Towers Tenants Association ("ATTA"), Vera

Ruser, who is President of ATTA, and the partners of the law firm Foley, Hoag & Eliot ("Foley"). E & G alleges that Defendants wrongfully prevented it from buying the Alban Towers apartment building in Washington, D.C., through a carefully orchestrated scheme spanning almost three years.

E & G's claims arise from its contract to buy the Alban Towers apartment building from Georgetown University. Under the District of Columbia Rental Housing Conversion and Sale Act, §§ 45–1601 et seq. (the "Act"), that contract was subject to ATTA's right of first refusal. ATTA attempted to exercise its right but failed to obtain the necessary financing. Georgetown sued ATTA in the Superior Court of the District of Columbia to clear title to the project and E & G intervened in Georgetown's action against ATTA. The Superior Court order was decisively determined in favor of Georgetown. On appeal, that decision was affirmed. Despite the favorable court decision, the "downturn" in the economy between the original contract and the favorable determination in court made it impossible for E & G to obtain financing and complete its purchase of Alban Towers.

In this suit, E & G seeks to recover the profits it claims it lost because its contract with Georgetown fell through. E & G alleges (1) tortious interference with contractual relations, (2) two counts of abuse of process, (3) malicious prosecution, (4) violations of the federal Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 et seq., and (5) conspiracy to commit RICO violations. E & G seeks compensatory damages of $6,000,000 and punitive damages of $20,000,000.

Before the Court is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment. On July 21, 1993, a hearing was held on Defendants' motion. For the reasons stated below, Defendants' motion will be granted.

1. The real party in interest is Georgetown University which owns Alban Towers.

## I. FACTUAL BACKGROUND

In 1986, E & G entered into a contract with Alban Towers Limited Partnership ("Georgetown")[1] to purchase Alban Towers, an apartment building in the District of Columbia. The contract acknowledged that under the D.C. Rental Housing Conversion and Sale Act the tenants had right of first refusal against any prospective purchaser of Alban Towers.

That Act provides that "[b]efore an owner of a housing accommodation may sell the accommodation ... the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale." D.C.Code § 45–1631(a). The purpose of this ordinance is to give tenants some rights to continue living in their apartments when the owners determine they want to convert a rental project to condominium housing. Under the Act, tenants are entitled to at least 120 days to negotiate a contract of sale, D.C.Code § 45–1640(2), and a 15–day period in which to exercise a right of first refusal, D.C.Code § 45–1637.

After receiving Georgetown's offer of sale, the tenants of Alban Towers incorporated as the Alban Towers Tenants Association for the purpose of purchasing Alban Towers. ATTA retained Richard Gross, a partner in the law firm of Foley, Hoag & Eliot, to assist in negotiating and financing the deal.[2] ATTA also chose a development company, HDS, Inc., to devise a plan for redeveloping Alban Towers, obtain financing for the redevelopment, and secure the $650,000 deposit required by the proposed contract ultimately agreed upon between Georgetown and ATTA.

The negotiation period for Alban Towers began on August 12, 1986, and ended on December 30, 1986. The final draft of the proposed contract between ATTA and Georgetown provided that:

"[n]ot later than 5:00 p.m. on Thursday, December 30, 1986, purchaser shall deliver to seller an irrevocable letter of credit in

2. Approximately sixty partners of Foley have been named as individual defendants by E & G. However, only the activity of Mr. Gross is at issue in this case.

the amount of six hundred and fifty thousand dollars ... or shall deposit with Real Title Company, Inc. the sum of six hundred and fifty thousand dollars in cash, as an earnest money deposit with respect to the property[.]"[3]

Sometime between the afternoon of December 30 and the close of business on December 31, 1986, a deposit check for $650,000 was delivered on behalf of ATTA to Real Title Company, Inc. for Georgetown. Because the check was unfunded, it did not satisfy ATTA's obligation under its proposed contract with Georgetown. Georgetown, informed of this development, treated the negotiations with the ATTA as over.

On January 5, 1987, ATTA, through Mr. Gross, filed a Notice of Exercise of Rights of First Refusal with the District of Columbia Recorder of Deeds. This had the effect of clouding title on the project. On February 2, 1987, Georgetown filed a complaint in Superior Court of the District of Columbia seeking a declaration that Georgetown be permitted to sell Alban Towers to E & G. On February 6, 1987, the Recorder of Deeds expunged ATTA's Notice of Exercise of Rights of First Refusal. E & G intervened in Georgetown's suit against ATTA, seeking a declaratory judgment and asserting claims against ATTA for tortious interference with contractual relations and tortious interference with business relations.

On October 6, 1988, Judge Henry Greene of the D.C. Superior Court granted summary judgment in favor of Georgetown and partial summary judgment in favor of E & G,[4] and held that those parties were "free to close on their third-party contract for the purchase of Alban Towers." *Alban Towers Limited Partnership v. Alban Towers Tenants Association*, No. 87–822, slip op. at 18. ATTA moved for reconsideration which Judge Greene denied. ATTA then appealed. On December 1, 1989, the Court of Appeals affirmed Judge Greene's order, *Alban Towers Tenants Association v. Alban Towers Limited Partnership*, No. 88–1488, slip op. at 2

(D.C.Ct.App.). By the time the Court of Appeals issued its opinion in December 1989, the real estate market had "turned down" and E & G could no longer obtain financing.

Three years later, in December 1992, with new counsel, Plaintiff brought this action against ATTA, Ruser and Gross in the Superior Court of the District of Columbia, alleging tortious interference with contractual relations and abuse of process. The complaint was removed to this Court in June 1993 after Plaintiff amended its complaint, adding an additional claim for abuse of process and two counts under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 *et seq.*

## II. THE RICO CLAIMS

■ E & G alleges that ATTA, Vera Ruser and Richard Gross engaged in an elaborate scheme of bribery and deceit "which was intended to delay or prevent the sale of Alban Towers to extort money from Edmondson & Gallagher and Georgetown."[5] Plaintiff contends that this "scheme" constituted a RICO violation under 18 U.S.C. § 1962(c).

RICO provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

In order to establish a pattern of racketeering activity under RICO, a plaintiff "must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original).

---

3. *Alban Towers Limited Partnership v. Alban Towers Tenants Association*, No. 87–822, slip op. at 8 (D.C.Super.Ct. Oct. 7, 1988).

4. Judge Greene's decision did not address the tort claims asserted by E & G.

5. Plaintiff's First Amended Complaint, ¶ 89.

E & G lists a variety of predicate acts spanning approximately three years, including the following: preventing the sale and rehabilitation of commercial real property worth over $16,000,000; attempting to defraud Georgetown by delivering a bad check; attempting to commit extortion by improperly clouding title to Alban Towers; using interstate commerce facilities for extortion; submitting fraudulent affidavits to the court; bribing witnesses and deliberately concealing materials sought to be discovered in a lawsuit. Plaintiff alleges that these acts, taken together, constitute a scheme of racketeering activity in violation of RICO.

The Court finds that, under the circumstances of this case, these alleged acts do not demonstrate a pattern of racketeering. Rather, what is alleged is a single scheme, directed at a single victim, and resulting in a single, distinct injury—namely, the alleged interference with the contractual rights of E & G vis a vis Georgetown. This is insufficient to state a claim under RICO. *See, e.g., Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir.1990) (No claim where single scheme to accomplish "one discrete goal" directed at one individual with no potential to extend to other persons or entities).

Although RICO is an important law which has done much good to combat organized crime, too many private litigants have distorted the law in an effort to reach activities RICO was never intended to address. It is a blatant misapplication of RICO's treble damages remedy to seek to reach ordinary commercial activities such as that alleged by E & G. *See, e.g., Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989), *Pyramid Sec. Ltd. v. International Bank,* 726 F.Supp. 1377, 1385 n. 8 (D.D.C.1989), *aff'd,* 924 F.2d 1114 (D.C.Cir.), *cert. denied,* —— U.S. ——,

112 S.Ct. 85, 116 L.Ed.2d 57 (1991).[6] As the Ninth Circuit has observed, "RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar v. University Students Co–Op. Ass'n,* 965 F.2d 783, 786 (9th Cir.) *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).

Although the alleged predicate acts in this case spanned approximately three years, from early 1987 until late 1989, duration alone is not enough to demonstrate continuity for a RICO claim. This time period reflects the litigation process between Georgetown, E & G and ATTA. Alleging multiple predicate acts which took place over a three-year period and which were part of a single litigation process will not magically transform what at best are state tort claims into a federal RICO action.[7]

Based on the facts of this case, it is clear there is no basis for a RICO claim. ATTA asserted its statutory right of first refusal in the summer of 1986. Between August and December 1986 ATTA, primarily through Richard Gross, conducted negotiations with Georgetown. When the Georgetown–ATTA negotiations failed, Georgetown sought declaratory relief to clear title. E & G intervened in the suit and ATTA filed a counterclaim against Georgetown. The litigation ended in December 1989 when the D.C. Court of Appeals affirmed the Superior Court's order in favor of Georgetown. Even if it could be established that the Defendants devised a "scheme," it would have been to accomplish one discrete goal, not a conspiracy in violation of RICO.

Real estate developers face many risks when they proceed with condominium con-

**6.** *See also Committee to defend the United States Constitution v. Moon,* 776 F.Supp. 568 (D.D.C. 1991) (alleged scheme to achieve one instance of economic injury would not amount to a RICO claim).

Furthermore, Congressional intent indicates that RICO remedies are available only in relation to activities having some association with "racketeering" as that term is used in ordinary discourse. *Exeter Towers Associates v. Bowditch,* 604 F.Supp. 1547 (D.Mass.1985). *See also HMK Corp. v. Walsey,* 828 F.2d 1071, 1075 (4th Cir. 1987) *cert. denied,* 484 U.S. 1009, 108 S.Ct. 706,

98 L.Ed.2d 657 (1988) ("The existence of a pattern ... depends on context, particularly on the nature of the underlying offenses. Attention to the nature of the underlying offenses is necessary because the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine.")

**7.** *See HMK,* 828 F.2d at 1075 (no RICO claim though alleged fraudulent scheme spanned four years).

versions. That tenants may choose to exercise rights conferred to them under consumer protection laws must be factored into the developers' decisions. For tenants to pursue these rights is entirely foreseeable and it would defeat these worthwhile consumer protection laws to permit disappointed developers to assert RICO claims against tenants who aggressively seek to exercise these important rights conferred upon them. RICO simply has no office in cases of this kind.

## III. COMMON LAW CLAIMS

What remains, then, are Plaintiff's claims for tortious interference with contractual relations, abuse of process and malicious prosecution.

As with respect to the RICO allegations, Plaintiff's common law claims are based on the attempts of ATTA, Vera Ruser, and Richard Gross to exercise the tenants' rights to purchase Alban Towers through the ensuing three-year litigation.

Though unsuccessful, the tenants' attempt to purchase Alban Towers was through rights conferred under D.C. law. There is no suggestion that when ATTA entered into negotiations with Georgetown to purchase Alban Towers it did not intend to complete the purchase. The crux of Plaintiff's complaint is that the deposit made on ATTA's behalf to meet its contractual rights with Georgetown had no funds behind it. While not salutary, this act alone does not give rise to the multiple causes of action asserted by E & G. Nor do Defendants' subsequent efforts to defend themselves and assert a counterclaim in the litigation initiated by Georgetown provide a basis for Plaintiff's common law claims.[8]

First, the Plaintiff is barred from pursuing these claims at this juncture under the doctrine of laches and in the interest of finality of judgment. The gravamen of Plaintiff's common law claims is that ATTA had no legitimate basis on which to defend the first lawsuit or assert counterclaims and that it did so only to prevent the E & G–Georgetown deal from proceeding.[9] If ATTA's defense was as frivolous as Plaintiff suggests, E & G should have pursued its claims in that suit. Litigation must come to an end. Should this Court's disposition of Plaintiff's RICO claim give rise to another lawsuit alleging that Plaintiff's claim was frivolous? If the answer is yes, then of course this litigation would continue for years to come and could possibly spawn further litigation. Without particularized and discrete circumstances, parties cannot be permitted to piggyback one lawsuit on another in an endless series of litigation. Such "parasitic" lawsuits must be foreclosed.

There is no reason for Plaintiff to be asserting its common law claims in the instant lawsuit. It knew of its rights at the time of the original action initiated by Georgetown against ATTA. Indeed, E & G filed third-party claims against ATTA, specifically asserting tortious interference with its contractual and business relations. Since Judge Greene's decision did not address those claims, Plaintiff had the opportunity to subsequently pursue them in that litigation. Plaintiff deliberately chose not to go forward with that litigation. Rather, Plaintiff attempted to negotiate a cash settlement with ATTA so that it could proceed with its development. Indeed, Plaintiff offered ATTA $1.6 million to give up its rights in the project. It is ironic that if ATTA had accepted Plaintiff's

---

8. In its counterclaims, ATTA sought declaratory and injunctive relief which would prevent Georgetown from selling Alban Towers to E & G and allow ATTA to purchase the building. Additionally, ATTA sought monetary damages from Georgetown but not from E & G.

9. E & G also claims that Defendants tendered the bad check on December 31, 1986—one day after the December 30 deadline set forth in ATTA's proposed contract with Georgetown. E & G further alleges that Defendants tried to cover up the late tender and that their actions to do so

demonstrate bad faith and illicit motivation behind ATTA's actions.

Even if true, Plaintiff's allegations in this regard provide scant evidence that ATTA's efforts to purchase Alban Towers were not in earnest. Moreover, Judge Greene did not find the timing issue to be of any moment; his decision turned on the fact that the check tendered by ATTA was unfunded, not on when the bad check was tendered. Apparently, Georgetown's rejection of the deal and termination of the negotiations with ATTA were also based on the insufficiency of the funds, not on the timing of the check's delivery.

offer of $1.6 million, E & G would not now be suing Defendants for $26 million.

There is little excuse in E & G's failure to pursue its claims in the first lawsuit. E & G made a strategic business decision to negotiate rather than pursue its tort claims in court. That E & G's strategy failed does not give it the right to reassert the same tort claims in a second suit some six years later.

■ Plaintiff's claims are also suspect because of Plaintiff's lack of privity with the Defendants. Georgetown is the real party in interest in the case. The District of Columbia's Rental Housing Conversion and Sale Act provides that a tenant organization shall have at least 120 days to negotiate a contract with a building owner, D.C.Code § 45–1631. If Georgetown wished to extend the negotiation period, it could have done so. E & G had no rights in the negotiation between Georgetown and ATTA and could not have compelled Georgetown to terminate negotiations with ATTA. Thus, if any party has suffered clear, direct injury in the case, it is Georgetown. Yet Georgetown has chosen not to file suit and there is nothing in the record indicating that Georgetown has assigned any of its rights to E & G.

The ensuing lawsuit between Georgetown and ATTA did not make E & G a third party beneficiary of the outcome of that lawsuit. Since E & G intervened in the lawsuit, it is difficult to understand how E & G now has the right to assert tort claims based on the original lawsuit. In short, E & G is now impermissibly attempting to exercise rights it never had and was never assigned.[10]

## IV. NOERR–PENNINGTON

■ Defendants actions in defending their rights are protected by the First Amendment to the U.S. Constitution which protects the rights of citizens to petition the government to seek redress of grievances. Thus, a person cannot be held liable as a result of his or her filing a good-faith lawsuit or administrative claim or otherwise seeking governmental redress. *See Eastern R. Pres-*

*idents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); accord, *Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). This principle has become known as the Noerr–Pennington Doctrine.

While this right was first recognized by the Supreme Court in the context of antitrust litigation, it has been extended beyond that context. "[I]f a person has a protected right to bring an objectively-based antitrust claim against a competitor, the same protection must be afforded to others who bring other such objectively-based claims and allegations before a government agency or court." *Whelen v. Abell,* 827 F.Supp. 801, 803 (D.D.C.1993). *See also Havoco of America, Ltd. v. Hollobow,* 702 F.2d 643, 649 (7th Cir.1983).

In addition, while Noerr–Pennington is generally applied to protect *plaintiffs* who have petitioned the government for redress, there is no reason the doctrine should not be extended to protect a party who attempts to exercise a statutory right and then must defend that right in subsequent litigation filed against it.

The immunity provided under Noerr–Pennington is qualified by a so-called "sham exception." Under the sham exception, otherwise protected activity does not qualify for Noerr–Pennington immunity "if it is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,* ——— U.S. ———, ———, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993), *Whelen v. Abell,* 827 F.Supp. 801, 803 (D.D.C.1993).

In *Professional Real Estate Investors,* the Supreme Court articulated a two-prong test to determine whether the "sham exception" applies:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the

---

10. To permit a contractor to assert rights such as Plaintiff pursues in this case would also allow subcontractors to pursue their lost expectations. The D.C. law would certainly become a dead

letter if tenants could be made subject to the contingent and speculative contract expectancies of such remote parties.

merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized ... Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.

*Professional Real Estate Investors*, —— U.S. at ——, 113 S.Ct. at 1928.

In this case, Defendants pursued their right to purchase Alban Towers. When Georgetown sued to clear title, ATTA defended itself. Though they may have made mistakes during the litigation, the tenants had the right to defend the suit in pursuit of their intent to purchase the building. This Court does not find that ATTA's counterclaim against Georgetown can in anyway be considered a "sham action" against Plaintiff, who was not a named party in the counterclaim.

## V. CONCLUSION

While the Court is ruling in favor of Defendants, the behavior of ATTA and its counsel is far from exemplary. Judge Greene found that ATTA tendered an unfunded check to Georgetown. *Alban Towers Limited Partnership v. Alban Towers Tenants Association*, No. 87–822, (D.C. Oct. 7, 1988). In addition, some of Plaintiff's allegations about the conduct of Mr. Gross are troublesome. In rendering its decision today, this Court is in no way condoning such behavior if the allegations are in fact true.

However, to permit this lawsuit to proceed would be a severe blow to the rights created by the District of Columbia Rental Housing Conversion and Sale Act of 1980, the purpose of which is to strengthen "the legal rights of tenants or tenant organizations to the maximum extent permissible under the law."

D.C.Code § 45–1661. Tenants' associations seeking to exercise the rights provided by the Act will undoubtedly falter and misstep. Such groups often are put together quickly on a reactive ad hoc basis by tenants unsophisticated in commercial real estate transactions. These highly vulnerable persons should not be punished if they err or are represented by overly zealous counsel. Whether or not E & G were ultimately successful, if this suit is permitted to go forward, it will have a chilling effect on future tenants associations' pursuit of their rights. Indeed, this case resembles a so-called "SLAPP"— "strategic lawsuits against public participation"—suit in which parties attempt to use litigation as a weapon to punish community activists for exercising their rights.[11]

E & G, if it could meet the appropriate standing requirements, had ample opportunity to challenge the arguments and conduct of ATTA during the first litigation filed by Georgetown in 1987. To permit E & G to pursue this action where it seeks $26 million against a tenants association for exercising rights conferred by law would ironically be a greater abuse of process than the one Plaintiff claims it has been subjected to in this case. Accordingly, Defendants' Motion to Dismiss is granted. An appropriate order accompanies this opinion.

### *ORDER*

Presently before the Court is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgement. Upon consideration of Defendants' motion and Plaintiff's opposition thereto, and after conducting a hearing on the matter on July 21, 1993, for the reasons stated in the foregoing Memorandum Opinion, it is this 30 day of July, 1993 hereby

ORDERED that Defendants' Motion is granted. It is

FURTHER ORDERED that this matter is dismissed with prejudice.

---

**11.** This case would not be the first time a real estate developer filed such a suit against an individual or organization who opposed the develop-

er's projects. *See e.g., Westfield Partners, Ltd. v. Hogan,* 740 F.Supp. 523, 525 (N.D.Ill.1990).