EDMONDSON & GALLAGHER, Thomas Gallagher and James Edmondson, Appellants,

v.

ALBAN TOWERS TENANTS ASSOCIATION; Vera Ruser; Richard A. Gross; Charles J. Beard; Richard W. Benka; Stanley B. Bernstein; Robert L. Birnbaum; Deborah B. Breznay; James K. Brown; John L. Burke, Jr.; Philip Burling; Laurie Burt; Stefanie D. Cantor; William J. Cheesman; Mark F. Clark; Peter W. Coogan; Stephen B. Deutsch; David B. Ellis; Peter B. Ellis; H. Kenneth Fish; Kevin J. Fitzgerald; Edward N. Gadsby, Jr.; Louis P. Georgantas; David R. Geiger; Kenneth L. Grinnell; Dean F. Hanley; Thomas M.S. Hemnes; John H. Henn; Christian M. Hoffman; Wendy B. Jacobs; Dennis R. Kanin; Michael B. Keating; Henry M. Kelleher; Bruce A. Kinn; William B. Koffel; Sandra L. Lynch; Paul V. Lyons; Paul Randolph Murphy; John D. Patterson, Jr.; Steven W. Phillips; David R. Rosenblum; Robert S. Sanoff; Leonard Schneidman; Sandra Shapiro; James A. Smith; Adam Sonnenschein; Sandra L. Spalletta; John M. Stevens, Jr.; Cathleen Douglas Stone; Robert W. Sweet, Jr.; Arthur G. Telegan; Marc K. Temin; Paul Robert W. Sweet, Jr.; Donald R. Tsongas; Verne W. Vance, Jr.; David W. Walker; Donald R. Ware; David L. Weltman; Barry B. White; Brandon F. White; Deborah A. Willard; Toni G. Wolfman; Arnold M. Zaff, Appellees.

James P. BYRD, Appellant,

v.

ALBAN TOWERS TENANTS ASSOCIATION; Vera Ruser; Richard A. Gross; Charles J. Beard; Richard W. Benka; Stanley B. Bernstein; Robert L. Birnbaum; Deborah B. Breznay; James K. Brown; John L. Burke, Jr.; Philip Burling; Laurie Burt; Stefanie D. Cantor; William J. Cheesman; Mark F. Clark; Peter W. Coogan; Stephen B. Deutsch; David B. Ellis; Peter B. Ellis; H. Kenneth Fish; Kevin J. Fitzgerald; Edward

N. Gadsby, Jr.; Louis P. Georgantas; David R. Geiger; Kenneth L. Grinnell; Dean F. Hanley; Thomas M.S. Hemnes; John H. Henn; Christian M. Hoffman; Wendy B. Jacobs; Dennis R. Kanin; Michael B. Keating; Henry M. Kelleher; Bruce A. Kinn; William B. Koffel; Sandra L. Lynch; Paul V. Lyons; Paul Randolph Murphy; John D. Patterson, Jr.; Steven W. Phillips; David R. Rosenblum; Robert S. Sanoff; Leonard Schneidman; Sandra Shapiro; James A. Smith; Adam Sonnenschein; Sandra L. Spalletta; John M. Stevens, Jr.; Cathleen Douglas Stone; Robert W. Sweet, Jr.; Arthur G. Telegan; Marc K. Temin; Paul Robert W. Sweet, Jr.; Donald R. Tsongas; Verne W. Vance, Jr.; David W. Walker; Donald R. Ware; David L. Weltman; Barry B. White; Brandon F. White; Deborah A. Willard; Toni G. Wolfman; Arnold M. Zaff, Appellees.

Nos. 93–7146, 94–7064.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 1994.

Decided March 10, 1995.

David J. Branson, Washington, DC, argued the cause, for appellants. With him on the briefs was Daniel J. Culhane, Washington, DC.

Rodney F. Page, Washington, DC, argued the cause, and filed the brief, for appellees. James B. Rosenthal, Cleveland, OH, entered an appearance, for appellees.

Before: EDWARDS, Chief Judge; WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

These consolidated cases arise from Edmondson & Gallagher's failed attempt to purchase the Alban Towers apartment building from Georgetown University. Edmondson & Gallagher and its real estate broker, James Byrd, brought separate suits in D.C. Superior Court against Alban Towers Tenants Association, its president, Vera Ruser, and its lawyers, Richard Gross and the law firm at which he was then a partner, Foley, Hoag & Eliot. The plaintiffs alleged tortious interference with contract, abuse of process, malicious prosecution, and conspiracy to violate and violation of RICO, the Racketeer Influenced and Corrupt Organizations statutes, 18 U.S.C. §§ 1961, 1962(c) & (d) (1988 & Supp.1993).

The defendants removed the cases to federal district court and there filed motions to dismiss or, in the alternative, for summary judgment. The district court granted these motions (without distinguishing between the two) in two memorandum opinions. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 829 F.Supp. 420 (D.D.C. 1993); *Byrd v. Alban Towers Tenants Ass'n,* Civ. No. 93–1611 (D.D.C. Feb. 28, 1994). The court found that the predicate acts alleged under RICO did not constitute a "pattern of racketeering activity" and failed to meet RICO's continuity requirement. Having dismissed the federal claims, the district court exercised its supplemental jurisdiction over the state claims and dismissed them as well, invoking such grounds as laches, the *Noerr–Pennington* doctrine, and an unnamed principle that appears somewhat akin to claim or issue preclusion. 829 F.Supp. at 425–29.

We affirm the district court's dismissal of plaintiffs' RICO claims, because we find that the single scheme alleged—designed to frustrate one transaction and inflicting a single, discrete injury on a small number of victims—fails to meet RICO's requirement of a "pattern of racketeering activity". After the district court dismissed the federal claims, however, it abused its discretion by reaching the merits of the local-law claims. We therefore vacate that portion of the judgment and remand the case to the district court with instructions that it either remand the case to D.C. Superior Court, or dismiss without prejudice so that Edmondson & Gallagher may refile its claims there. See *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (holding district courts have authority to remand a removed case to state court or dismiss without prejudice when all federal claims have dropped out and only pendent claims remain); 28 U.S.C. §§ 1367(c), (d) (Supp.1993).

\* \* \*

In reviewing the grant of the motion to dismiss, we accept as true the allegations of the two complaints, which are substantially identical. See *Whitacre v. Davey,* 890 F.2d 1168, 1168 (D.C.Cir.1989). According to them, Edmondson & Gallagher, with Byrd as

its broker, agreed in July 1986 to purchase Alban Towers from Georgetown University for an initial purchase price of $16 million, to be increased by $35,000 every month until closing. Edmondson & Gallagher tendered a $650,000 letter of credit as an earnest money deposit. As in any sale of a "housing accommodation" with five or more units in the District of Columbia, the tenants of Alban Towers enjoyed a statutory right of first refusal; they could purchase the building themselves if they could match Edmondson & Gallagher's contract terms, including the $650,000 earnest money deposit in cash or a letter of credit, by December 30, 1986. See D.C.Code §§ 45–1631 *et seq.* (1981).

The tenants formed the Alban Towers Tenants Association and retained Richard Gross and Foley, Hoag & Eliot as counsel. To raise the money to match Edmondson & Gallagher's $650,000 deposit, as well as the $16 million purchase price, they turned to a small development company called HDS and its co-venturer, George Van Wagner.

On December 30, 1986, the last day the tenants could exercise their statutory right of first refusal, Gross tendered a signed purchase agreement on their behalf to Georgetown's escrow agent, but no deposit. According to the complaints, then, the tenants failed to exercise their rights, and those rights expired. Nevertheless, on December 31, defendants had Van Wagner send the escrow agent a $650,000 personal check drawn on Van Wagner's account. Plaintiffs allege that the check was not only untimely, but worthless: Van Wagner's bank account contained only $433.16 on the date the check was tendered, it had been overdrawn several times in that period, and its balance had never exceeded $2300. Despite the tenants' failure to satisfy the conditions for exercising their right of first refusal, Gross filed a "Notice of Exercise of Rights of First Refusal" with the D.C. Recorder of Deeds on January 5, 1987. The document clouded title to the building; to obtain the title insurance required by the contract of sale, Georgetown had to file a lawsuit to clear title.

According to the complaints, the tenants exploited this quiet-title action, holding the building sale hostage and thereby attempting

to force Edmondson & Gallagher or Georgetown to pay them off. They pursued an objectively baseless defense by means of perjury, fraud, and bribery, solely to stall summary judgment, demanding $2,000,000 to settle. In particular, they stalled by filing an answer falsely stating that Georgetown prevented Van Wagner's check from being funded, by repeatedly concealing Van Wagner's whereabouts, and by deliberately submitting false statements by Gross, Van Wagner, and others.

For example, the complaints state that although Gross knew that Van Wagner's check was both a day late and worthless, he opposed Georgetown's summary judgment motion with false affidavits from Van Wagner and two of his associates swearing (1) that Van Wagner's check had been delivered on December 30, within the statutory time period, and (2) that Van Wagner had adequate funds to cover the check. They allege that the affidavits, besides being perjured, were secured by bribery and fraud—by false promises of millions of dollars of business for Van Wagner.

Throughout the litigation, title to Alban Towers remained clouded. When the D.C. Court of Appeals finally decided that the sale to Edmondson & Gallagher could go forward in December 1989, nearly three years after the expiration of the tenants' right to purchase, market conditions had changed substantially and made the contract, in plaintiffs' words, "unperformable".

\*　　　\*　　　\*

RICO authorizes civil suits by "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c) (1988). Section 1962 contains four separate subsections, each addressing a different problem. Edmondson & Gallagher has alleged violations of two of these subsections: § 1962(c), which prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conduct[ing] or participat[ing] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity"; and § 1962(d), which prohibits any person from "conspir[ing] to violate any of the provisions of subsection (a), (b), or (c)."

A "pattern of racketeering activity" requires commission of at least two predicate offenses on a specified list. 18 U.S.C. §§ 1961(1), (5) (1988 & Supp.1993). Plaintiffs have alleged an adequate number of predicate offenses, including bribery, extortion, wire and mail fraud, and interstate travel in aid of racketeering activity. The Supreme Court, however, has made clear that in addition to the requisite number of predicate acts, the plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). The Court said that the latter concept, "continuity", refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Plaintiffs claim that the defendants' activity satisfies both tests.

■ The claim that defendants' activity posed a future threat has no apparent basis. As we have previously noted, *H.J.*'s illustrations of open-ended continuity "indicate a requirement of far more than a hypothetical possibility of further predicate acts." *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1119 (D.C.Cir.1991). In this case, the plaintiffs point to nothing suggesting any reason to expect that these defendants, together or separately, will again engage in RICO-violating conduct. The only possible rationale that could support such a prediction—once a RICO violator, always a RICO violator—would deprive the pattern requirement of all meaning by establishing open-ended continuity whenever two or more predicate acts were shown.

■ We thus focus on plaintiffs' allegations of a closed period of continuous criminal activity. The Court in *H.J.* offered few clues about what characteristics of a closed period would establish the requisite pattern, noting only that Congress intended a "natural and commonsense approach to RICO's pattern element", 492 U.S. at 237, 109 S.Ct. at 2899, and that the "development of [the concepts of relatedness and continuity] must await future

cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope", *id.* at 243, 109 S.Ct. at 2903.

Courts have considered many factors in deciding whether a pattern has been established. The Third Circuit, for example, has listed "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity ... as they bear upon the separate questions of continuity and relatedness." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411–13 (3d Cir.1991) (citing *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36, 39 (3d Cir.1987)).[1] In some cases, however, some factors will weigh so strongly in one direction as to be dispositive. This is such a case.

Plaintiffs here have alleged only a single scheme—to prevent or delay the sale of Alban Towers, or to secure a ransom for allowing the sale to proceed. Moreover, the scheme entails but a single discrete injury, the loss of the sale (or payment of the ransom), suffered by a small number of victims. The latter number only three: Edmondson & Gallagher, Byrd and Georgetown (we see no basis for defendants' suggestion that a nonplaintiff cannot be a victim). We think that the combination of these factors (single scheme, single injury, and few victims) makes it virtually impossible for plaintiffs to state a RICO claim. In *Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507 (10th Cir.1990), the court held that multiple predicate acts failed to show a pattern where the acts "constituted a single scheme to accomplish 'one discrete goal,' directed at one individual with no potential to extend to other persons or entities." *Id.* at 1516. Plaintiffs correctly point out that three victims are more than one, but the distinction seems slight and the similarity between the cases—the single discrete goal—far more important. The number of alleged predicate acts (fifteen), and the most generous estimate of the length of time

the acts continued (three years, but with almost all occurring in December 1986–January 1987 and the fall of 1988), are not enough to overwhelm the three narrowing factors.

Plaintiffs suggest that the Second Circuit's decision in *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.) (en banc), *vacated for further consideration in light of H.J.,* 492 U.S. 229, 109 S.Ct. at 2895–96, *adhered to,* 893 F.2d 1433 (1989), presents a similar single-scheme case in which the court found a pattern of racketeering. *Beauford* also involved a single scheme and a proposed conversion of apartments into condominiums, but there the similarity stops. According to the allegations in that case, defendants committed fraud by separate mailings to the tenants of over 8,000 apartments in dozens of apartment buildings (all parts of the Parkchester complex in Bronx, N.Y.) over a period of 13 years. Moreover, with 40% of the apartments remaining unsold, there was reason to believe that more fraud would follow, creating an open-ended "threat of continuity." *Id.* at 1392.

■ We agree with the district court's conclusion that the "alleged acts do not demonstrate a pattern of racketeering", but rather a single scheme, directed at few victims, "and resulting in a single, distinct injury". 829 F.Supp. at 424. Further, as the allegations provide no basis for inferring any conspiracy broader than the alleged scheme itself, the § 1962(d) claim fails as well; there is no conspiracy "to violate any of the provisions of subsection" (c).

\*       \*       \*

■ Having properly dismissed plaintiffs' RICO claim, the district court was left with the pendent common law claims under D.C. law. Because the case had raised a legitimate federal question and the common law claims formed "part of the same case or controversy," 28 U.S.C. § 1367(a) (Supp. 1993), the district court clearly had the power to decide the common law claims. Whether actually to decide them is a matter left to

---

**1.** Cf. *Tabas v. Tabas,* 47 F.3d 1280 (3d Cir.1995) (en banc) (finding no need to review all *Barticheck* factors where the alleged scheme lasted over three years, cost the multiple victims money every month, and threatened to continue indefinitely, thus satisfying both closed and "open-ended" continuity).

the sound discretion of the district court, guided by consideration of the factors enumerated in 28 U.S.C. § 1367(c), which essentially codifies the leading decision on pendent (now "supplemental") jurisdiction, *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We review for abuse of discretion. *Diven v. Amalgamated Transit Union International & Local 689,* 38 F.3d 598, 601 (D.C.Cir.1994). Here, if the district court considered the relevant factors at all, it left no written trace of the process; after dismissing the RICO claims, the court plunged into the common law ones with no apparent pause for breath. See 829 F.Supp. at 425.

Section 1367(c) provides as follows:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) The claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). *Gibbs* determines the framework in which these are to be considered, mentioning judicial economy, convenience, fairness and comity as relevant. 383 U.S. at 726, 86 S.Ct. at 1139.

■ The present case implicates two of the three specific bases for declining to exercise supplemental jurisdiction under § 1367(c), each independently sufficient. The court dismissed all claims over which it had original jurisdiction, § 1367(c)(3), and the local law claims raise "novel or complex issue[s] of State law," § 1367(c)(1), issues that appear to have been resolved in conflicting ways by D.C. courts and federal courts attempting to apply D.C. law.

One example will adequately illustrate the latter point. D.C. courts have held that a breach of contract is an essential element of the tort of "tortious interference with contractual relations." See, e.g., *Cooke v. Griffiths–Garcia Corp.,* 612 A.2d 1251, 1256 (D.C. 1992) (citing *Altimont v. Samperton,* 374 A.2d 284, 288 (D.C.1977)). Some federal courts applying D.C. law, however, have said that a breach is not required to prove "tortious interference with contract," but only proof that "defendant intentionally interfered with the contract without justification." *Equity Group, Ltd. v. Painewebber, Inc.,* 839 F.Supp. 930 (D.D.C.1993) (citing *Dunn v. Cox,* 163 A.2d 609, 611 (D.C.1960)). It might be tempting to conclude that the difference in elements results from the existence of two different torts ("tortious interference with contractual relations" and "tortious interference with contract"). Maybe so, but the courts appear to use these terms interchangeably. *Altimont,* cited for "tortious interference with contractual relations", lists the elements for "inducement of breach of contract," 374 A.2d at 288, while *Dunn,* cited for "tortious interference with contract", discusses the tort of "interference with contractual relations." 163 A.2d at 611. Because Edmondson & Gallagher's contract with Georgetown may not have been breached, the entire tortious interference with contract claim may turn on this issue. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. D.C. courts are better equipped to resolve the unsettled legal questions in this case.

Thus comity and fairness point strongly toward having the District of Columbia's courts decide the claims. The other interests mentioned by *Gibbs,* judicial economy and convenience, provide no serious counterweight. As to judicial economy, the district court has invested virtually no time on any of the issues left to be resolved in this case. There has been no trial of the common law claims, and little analysis. While we do not reach the grounds on which the district court dismissed these claims, we could affirm its conclusions (if at all) only with very careful new analysis (i.e., expenditure of substantial judicial resources). Cf., e.g., *Whelan v.*

*Abell,* 48 F.3d 1247 (D.C.Cir.1995) (holding that neither the *Noerr–Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation). And, under the circumstances, there seems little difference in convenience for the parties whether they litigate in D.C. or federal court.

■ We therefore remand the case to the district court with instructions that it should either remand the matter to the courts of the District of Columbia, or dismiss without prejudice so that Edmondson & Gallagher have the opportunity to file there again. Whether to remand or dismiss is a matter normally left to the discretion of the district court, see *Carnegie–Mellon,* 484 U.S. at 357, 108 S.Ct. at 622–23. We find this discretion unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990, Pub.L. No. 101–650, 104 Stat. 5113 (1990). Section 1367(d) tolls the state statute of limitations on any state claim over which a federal court has exercised supplemental jurisdiction until 30 days after its dismissal. It thus reduces one concern expressed in *Carnegie–Mellon*—that plaintiffs would lose their claims if their case were dismissed rather than remanded. Other concerns remain, however, such as convenience to the parties and a faster resolution of the case. We find no indication in the legislative history of the Judicial Improvements Act that Congress intended to limit the district court's discretion to remand in a case removed from state court. See H.R.Rep. No. 734, 101st Cong., 2d Sess. 30 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6802, 6876. On remand, therefore, the district court will exercise its discretion either to dismiss without prejudice under §§ 1367(c), (d) or to remand the case to the District of Columbia courts under *Carnegie–Mellon.*

*So ordered.*